# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>The SUBJECT PREMISES located<br>at 1714 Cedar Street,<br>Apartment A, Alhambra, California<br>91801 | )<br>)<br>)<br>)<br>)<br>)    Case No.    2:18-mj-2688 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| *Title 7, U.S. Code, Section 2156(e) and Title 18 U.S. Code, Section 49* | *Selling sharp instruments for animal fighting venture/enforcement of animal fighting venture prohibitions* |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

MARK TRACHTENBERG, Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   October___, 2018_____

_____
*Judge's signature*

City and state:  Los Angeles, CA_____

HON. KAREN STEVENSON, U.S. Magistrate Judge
*Printed name and title*

AUSA: Dennis Mitchell (x2484)

## **ATTACHMENT A**

SUBJECT PREMISES TO BE SEARCHED

The SUBJECT PREMISES is located at 1714 Cedar Street, Apartment A, Alhambra, California 91801.  The SUBJECT PREMISES consists of apartment unit A in a multi-family condominium building (the "building") and a two-car garage which is associated with unit A.  The building is a three-story building with tan stucco, brown trim features, and a brown tile roof. The building appears to have six apartment units which are identified as units "A" through "F."  Each of the apartment units, such as the SUBJECT PREMISES, has two floors of living space and a two-car garage associated with it.

When facing the building, one can see a driveway on the right side that leads to the garages.  On the left side of the building, one can see a walkway that runs the length of the building.  Past a mailbox panel along the walkway, there are three separate stairwells, each of which leads into one or two of the building's apartment units.  At the top of the first stairwell, on the right side, there is a door labeled "A", and on the left side, opposite the door labeled "A," is a door labeled "B."  The door labeled "A" is the entry door to the SUBJECT PREMISES.  Past these doors, there are stairs that lead down between these units to the garage level.

The SUBJECT PREMISES is the apartment unit in the building which is closest to Cedar Street. The aforementioned door which is labeled "A" is brown and appears to be the only door in the living space of the SUBJECT PREMISES.  The garage portion of the SUBJECT PREMISES is accessible from the driveway and is located below the living space of the SUBJECT PREMISES and is the garage space that is closest to Cedar Street.

**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 7 U.S.C. § 2156(e) (selling sharp instruments for animal fighting venture) and 18 U.S.C. § 49 (enforcement of animal fighting venture prohibitions) (the "Subject Offense"), namely:

a.  All records and documents relating or referring to cockfighting.

b.  All records and documents relating or referring to any purchase, sale, offer to sell, offer to purchase, or delivery of any instrument, material, or equipment used in cockfighting.

c.  All records and documents relating or referring to any cockfighting event.

d.  All records and documents referring or relating to any moneys expended or received in connection with any sale or purchase of any instrument, material, or equipment used in cockfighting.

e.  All records and documents relating or referring to any raffle in which any instrument, material, or equipment used in cockfighting was or is to be given to the winner of the raffle.

f.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

g.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**VIII.**    **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

5

was encountered, including how it was immediately apparent contraband or evidence of a crime.

      d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

6

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Mark Trachtenberg, being duly sworn, declare and state as
follows:

## I.  INTRODUCTION

1.    I am a Postal Inspector ("PI") with the United States
Postal Inspection Service ("USPIS"), and have been so employed
since March 1, 2008.  As part of my training as a United States
Postal Inspector, I completed a twelve-week training course in
Potomac, Maryland, which included training in investigating
federal crimes perpetrated by use of the United States mails.  I
am presently assigned to a Dangerous and Prohibited Mailings
Investigative Team based in Los Angeles, California.  As a
Postal Inspector, I have participated in investigations of
various types of crimes including mail fraud and prohibited
mailings.  I have also worked closely with, and learned from,
other postal inspectors and other federal agents who are
experienced in investigating prohibited mailings.

## II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of an application
for a warrant to search the residential premises located at 1714
Cedar Street, Apartment "A," in Alhambra, California (the
"SUBJECT PREMISES") for evidence, fruits, and instrumentalities
of violations of 7 U.S.C. § 2156(e)[1] (selling sharp instruments

---

[1] Title 7, United States Code, Section 2156(e) provides: "It
shall be unlawful for any person to knowingly sell, buy,
transport, or deliver in interstate or foreign commerce a knife,
a gaff, or any other sharp instrument attached, or designed or
intended to be attached, to the leg of a bird for use in an

for animal fighting venture) and 18 U.S.C. § 49[2] (enforcement of animal fighting venture prohibitions), as described in Attachment B.  Attachments A and B are incorporated herein by this reference.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. PREMISES TO BE SEARCHED

4.     The SUBJECT PREMISES is located at 1714 Cedar Street, Apartment A, Alhambra, California 91801, and is more particularly described in Attachment A, which is incorporated herein by this reference.

---

animal fighting venture."  An "animal fighting venture" is defined as any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least two animals for purposes of sport, wagering, or entertainment.  However, the term does not include any activity the primary purpose of which involves the use of an animal for hunting another animal.

[2] Title 18, United States Code, Section 49(a) provides, among other things, that whoever violates Title 7, United States Code, Section 2156(e) shall be fined under Title 18, imprisoned for not more than five years, or both.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

5.    On January 9, 2018, I met with Eric Lozano, an Animal Services Control Officer II for Ventura County, and, during our meeting, Officer Lozano informed me of the following:

a.    Officer Lozano's duties include enforcing animal-related laws;

b.    Officer Lozano's management authorized him to start an undercover Instagram account after Officer Lozano had read a newspaper article that described how an Animal Control Officer in another county had disrupted an illegal cockfighting ring using an undercover Instagram account;

c.    On or about May 20, 2016, Officer Lozano set up an undercover Instagram account under the user name "galloslibres805." Officer Lozano used a fake name on the undercover account and posted photographs on the undercover account which depicted, among other things, roosters and a set of gaffs to make the undercover account appear to originate from a real individual;

d.    Officer Lozano searched for hashtags associated with cockfighting on Instagram;[3]

e.    While viewing posts referencing cockfighting hashtags on Instagram, Officer Lozano identified an Instagram

---

[3] I know from my training and experience that a word or phrase preceded by a hashtag or pound sign ("#") is used to identify specific topics on social media sites, including Instagram.

account (the "Instagram Account") and found that the user of
that account used the user name "gallero_de_watts;"[4]

       f.   Officer Lozano determined that the user of the
Instagram Account ("gallero de watts") sold items that are used
exclusively for cockfighting.  Officer Lozano also observed that
gallero de watts held raffles whereby participants could
purchase a number to enter the raffle.  If the purchased number
was drawn, the purchaser won cockfighting-related items;

       g.   The cockfighting-related items sold or given as
prizes by gallero de watts on the Instagram Account included
gaffs, mounting blocks, and rooster puppets.  Gaffs are razor
blades that are attached to roosters' talons using mounting
blocks.  Rooster puppets are used to train fighting birds.
Officer Lozano told me that, based on his training and
experience as an animal control officer, those items have no
legitimate purpose beyond facilitating cockfighting;

       h.   Officer Lozano showed me a direct message
conversation he had, using the undercover account, with gallero
de watts that took place on September 13, 2017.  During that
conversation, Officer Lozano entered a raffle facilitated by
gallero de watts by purchasing a raffle number for $10.  The
purchaser of the winning number would win cockfighting
paraphernalia whose value exceeded the cost of the entry; and

---

[4] Within the last week, I conducted a search on the Google
website for the definition of "gallero."  According to the
website www.spanishdict.com, the term "gallero" means fond of
cockfighting, a cockfighting enthusiast.

i.   To have Officer Lozano enter the raffle, gallero de watts instructed Officer Lozano to send an entry fee to a PayPal account at odeezy106@yahoo.com.  After all the numbers were purchased, gallero de watts pulled the winning number out of a container during a live-stream broadcast on Instagram.  A recording of the video broadcast remained available for viewing on the Instagram Account for about 24 hours before being automatically removed.

6.   On January 9, 2018, Officer Lozano and I contacted the gallero de watts via direct message from the undercover account. Using Officer Lozano's undercover persona, we wrote to gallero de watts that Officer Lozano, in his undercover capacity, wanted to purchase a dozen gaffs, a mounting block, a puppet, and a box of a rooster vitamin supplements.  Gallero de watts agreed to sell the items for $325, including shipping.  Gallero de watts also agreed to accept payment using a postal money order and directed Officer Lozano to mail the payment to, "Omar Olmos Salazar" at the SUBJECT PREMESIS.[5]  Officer Lozano directed gallero de watts to send the purchased items to "Jose Lopez, PO Box 570896, Las Vegas, NV 89157," which was an undercover Post Office box controlled by the USPIS.

7.   On January 10, 2018, I reviewed the Instagram Account. There, I observed numerous cockfighting-related photographs.

_____

[5]   According to PayPal records that I received during the course of this investigation, Omar Olmos SALAZAR listed the SUBJECT PREMISES as his home or work address as of February 27, 2016.

One photograph contained six mounting blocks and five storage bags that appeared to contain cockfighting graphics printed on them.  The caption for that photo stated, "Also for sale." Another photograph showed 60 gaffs, and the caption for that photo stated, "More tools available for the interested.. Dm me 3,4 and 5 lines ask in what style."  Officer Lozano has informed me that, based on his experience, he knew that "Dm" stands for direct message.  Many other posts I observed made references to raffles of cockfighting-related items.

      a.   The Instagram Account also included a photograph of an individual that appeared to be gallero de watts.  In one photo, the individual was standing next to a cake, and the caption read, "My room mates surprised me with a cake…I'm an old man already lol."  The Instagram Account also included a photograph of a money order with "Omar Olmos" as the purchaser that was used to make a payment to a Payton Farms in 2014.  The photograph's caption read, "The time I purchased a pure brood stag McRae.. if anyone is interested in any of his fowl I will be going to his farm early December…Dm me there will be a small fee."  The purchaser's address written on the money order image was 921 N. Rowan Ave., Los Angeles, CA.

    8.   On January 10, 2018, I also reviewed driver's license data obtained from the California Department of Motor Vehicles database for driver's license number BXXXX217.  The name of the driver corresponding to that driver's license number was Omar Olmos SALAZAR (also referred to as "SALAZAR").  The address on the driver's license record was the address of the SUBJECT

PREMISIS.  The photograph on the driver's license record appeared to be the same person in the Instagram Account photo of the individual standing next to a cake.  The driver's license expires on December 27, 2021 and purported to contain SALAZAR's signature.

9.  On January 10, 2018, I mailed a $325 Postal Money Order (Serial Number 23726829148) to Omar SALAZAR at the address of the SUBJECT PREMISIS.

10.  On January 24, 2018, a USPIS General Analyst accessed the Federal Reserve Bank Check Image Retrieval system, which stores images of negotiated Postal Money Orders.  She provided me a copy of the front and back of the negotiated money order with the serial number 23726829148.  From looking at the endorsement on the back of that money order, I could see that the money order was negotiated at the Hazard Station Post Office in Los Angeles, California on January 16, 2018.  The back of the money order bore the redeemer's signature, the California Driver's license number BXXXX217, and a December 27, 2021 expiration date (which matches the license number and expiration date for SALAZAR's driver's license).  The redeemer's signature on that money order appeared to me to be similar to the signature on SALAZAR's driver's license.

11.  On January 16, 2018, Officer Lozano forwarded me a photograph of a post office receipt that he had received from gallero de watts.  The receipt showed several packages mailed at the Hazard Station Post Office on January 16, 2018, including a package bearing tracking number 9505 5143 9847 8016 1031 88.

7

12.  On January 18, 2018, I was contacted by Postal Inspector/Team Leader Shad Matheny who told me his staff member received a package with tracking number 9505 5143 9847 8016 1031 88.  A member of his staff agreed to put overwrap on the package and mail it to me at my office in Pasadena, California.

13.  On January 22, 2018, I received, at my office, the over-wrapped package which contained the unopened package with tracking number 9505 5143 9847 8016 1031 88.  The package contained the items purchased using Officer Lozano's undercover Instagram account, including a dozen gaffs, a mounting block, a puppet, and vitamin supplements.

14.  On January 22, 2018, I also reviewed the USPS mail tracking system.  That system showed that a package bearing tracking number 9505 5143 9847 8016 1031 88 was mailed on January 16, 2018, at the Hazard Station Post Office, and that the package was delivered to the USPIS undercover post office box at PO Box 570896, Las Vegas, Nevada 89157 on January 18, 2018.

15.  On January 25, 2018, a USPIS Contractor provided me a disk containing videos captured by the Hazard Station Post Office security cameras on January 16, 2018, at the approximate time the package with tracking number 9505 5143 9847 8016 1031 88 was mailed, namely, 4:44 p.m.  Based on my comparison of the image contained on SALAZAR's driver's license with the individual depicted in the videos, I concluded that the video showed SALAZAR mailing packages at the Hazard Station Post Office.

16.  On March 6, 2018, I checked a public records database maintained by Thomson Reuters ("the Thomson Reuters database"). The database indicated that Omar SALAZAR subscribed to utility services on March 23, 2014 for the premises located at address 921 N. Rowan Ave., Los Angeles, California.  That is the same address depicted on the money order image described in paragraph 7a, above.

17.  On August 25, 2018, Officer Lozano forwarded to me copies of two images.  Officer Lozano has informed me that he obtained these images while accessing the Instagram Account. The first image, which was posted on or about August 10, 2018, depicts a video image of a nico boot which, I am informed by Officer Lozano, is a short blade type instrument worn on the leg of a rooster for cockfighting.  Next to that video image, there is text language in which gallero de watts states, among other things, that he "will be raffling a professional Nico boot along with a zero mite box" and that "there will be two winners. First winner will win the Nico boot second winner the zero mite.."  In the second image, which was posted on or about August 21, 2018, there is a pair of similar boots and text language in which gallero de watts announces that he has "two professional direct nico boots for sale."

18.  As noted in paragraph 7a, a caption to a photograph indicates that SALAZAR has roommates.  Moreover, information obtained, within the last month, from a public records database maintained by the Thomson Reuters database and from the California Department of Motor Vehicles show that at least three

other individuals have a driver's license that have the SUBJECT
PREMISES listed as that person's address.  In addition, a
surveillance photo of the garage portion of the SUBJECT PREMISES
taken on May 31, 2018 depicts a car parked in that garage which
is registered to one of those three other individuals.
Therefore, it appears likely that SALAZAR has more than one
roommate at the SUBJECT PREMISES.  Consequently, during the
execution of the search warrant at the SUBJECT PREMISES, to the
extent that law enforcement agents executing the search
determine that SALAZAR does not have sole or joint access to one
or more parts of the SUBJECT PREMISES, the agents will not
conduct a search of that area(s).

19.  Within the last week, I checked the Thomson Reuters
database and found that the SUBJECT PREMISES is listed as
SALAZAR'S residence.  The Thomson Reuters database indicated an
entry on June 5, 2018 from Transunion, a credit reporting
agency, as its most recent source for SALAZAR's residence
address as the SUBJECT PREMISES.  Within the last week, I also
checked the U.S. Postal Service database for changes of address,
and I did not find any change of address which indicates that
SALAZAR has changed his address from that of the SUBJECT
PREMISES.

## V.   <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

20.  As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;

desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.  Based on my knowledge, training, and
experience, as well as information related to me by agents and
others involved in the forensic examination of digital devices,
I know that data in digital form can be stored on a variety of
digital devices and that during the search of a premises it is
not always possible to search digital devices for digital data
for a number of reasons, including the following:

        a.    Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment.  There are so many types of digital
devices and software programs in use today that it is impossible
to bring to the search site all of the necessary technical
manuals and specialized equipment necessary to conduct a

thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.  The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive

12

could contain as many as approximately 450 full run movies or
450,000 songs.

        d.   Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded
onto a hard drive, deleted, or viewed via the Internet.[6]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed

---

[6] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has

14

been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on

15

the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

        g.   Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby

traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

21.  Concurrently with this application for a search warrant, the government is also seeking a search warrant for the Instagram Account.  Other than that concurrent application, and what has been described herein, to my knowledge, the United States has not attempted or is attempting to obtain this data by other means.

## VI. ITEMS TO BE SEIZED

22.  Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence of violations of 7 U.S.C. § 2156(e) (selling sharp instruments for animal fighting venture) and 18 U.S.C. § 49 (enforcement of animal fighting venture prohibitions), will be found at the SUBJECT PREMISES.

## VII. CONCLUSION

23.  For all the reasons described above, there is probable cause to believe that evidence of violations of 7 U.S.C. § 2156(e) (selling sharp instruments for animal fighting venture) and 18 U.S.C. § 49 (enforcement of animal fighting venture prohibitions), as described above and in Attachment B of

this affidavit, will be found in a search of the SUBJECT
PREMISES, as further described above and in Attachment A of this
affidavit.

_____
MARK TRACHTENBERG
Postal Inspector,
United States Postal
Inspection Service

Subscribed to and sworn before me
this _____ day of October    , 2018.


_____
HONORABLE KAREN STEVENSON
UNITED STATES MAGISTRATE JUDGE